*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. S. MILLS, Minor.

UNPUBLISHED
February 24, 2025
10:43 AM

No. 366682
Wayne Circuit Court
Family Division
LC No. 2019-002253-NA

Before: YATES, P.J., and LETICA and N. P. HOOD, JJ.

PER CURIAM.

Respondent appeals as of right from the order terminating her parental rights to her minor child, ASM. We affirm.

## I. BACKGROUND

Respondent is the mother of seven children: MMM, BTJ, BJJ, BAJ1, BAJ2, AEW, and ASM. In August 2019, approximately 21 months before ASM's birth, Children's Protective Services (CPS) contacted respondent after receiving an allegation that she had improperly supervised her older children. Respondent also had a lengthy history of mental-health issues, having been diagnosed with bipolar I disorder, psychosis, adjustment disorder, and depressed mood. To address these issues, petitioner, the Department of Health and Human Services (DHHS), offered respondent several services, including mental-health services, parenting skills education, and employment and housing assistance. When respondent failed to complete these services, DHHS filed a petition in December 2019. DHHS asked the court to remove the older children from respondent's care, alleging that her untreated mental-health issues impaired her ability to parent them. The trial court authorized the petition and removed the children.[1]

---

[1] The trial court subsequently dismissed MMM and AEW from the proceedings after their respective fathers were awarded custody.

In March 2020, the trial court exercised jurisdiction over the older children, finding that respondent had "severe mental[-]health issues" that prevented her from providing proper care for them. To facilitate reunification, the trial court ordered respondent to participate in parenting classes, individual and family counseling, psychological and psychiatric evaluations, mental-health services, including taking prescribed medication, and supervised parenting time. The court further directed respondent to maintain suitable housing and legal income and to attend court hearings.

Over the next several months, respondent worked to complete her court-ordered treatment plan. Respondent was largely compliant; however, she struggled to take responsibility for her mental health and repeatedly denied having any mental-health issues. Despite concerns over respondent's refusal to acknowledge her mental-health issues, the trial court ordered that reunification efforts should continue.

While the child protective proceedings involving BTJ, BJJ, BAJ1, and BAJ2 were ongoing, respondent gave birth to her seventh child, ASM. In July 2021, DHHS petitioned to remove ASM, alleging that it was contrary to ASM's well-being to remain in respondent's care because respondent's four older children remained under the court's jurisdiction, respondent had not completed her treatment plan, and respondent was not in compliance with her mental-health treatment. Further, respondent had not rectified the conditions that caused her older children to be in care. The trial court authorized the petition and placed ASM into foster care.[2]

During the August 2021 adjudication pertaining to ASM, despite respondent acknowledging that she had been diagnosed with bipolar disorder, she testified that she did not believe she ever suffered from mental illness. Respondent's former therapist and her current foster-care worker expressed their concern that respondent was not benefitting from the services offered or taking responsibility for the reasons that the children were removed. Although the trial court believed that respondent had "worked really hard" to complete her treatment plan, it found sufficient evidence to take jurisdiction over ASM because it was "abundantly clear" that respondent was in denial of her "very significant and severe mental[-]health issues." The trial court ordered respondent to participate in parenting classes, individual counseling, psychological and psychiatric evaluations, mental-health services, obtain suitable housing and legal income, maintain regular contact with the foster-care worker, and attend court hearings.

Between November 2021 and July 2022, the trial court held several dispositional review and permanency planning hearings. During these hearings, the foster-care worker reported that respondent was "mostly" compliant with her treatment plan, but she was still not taking responsibility for her mental health and continuing to deny that she had mental-health issues. Respondent also engaged in a physical altercation with her mother in front of the children after accusing her mother of abusing her children. Likewise, respondent grew increasingly frustrated with the court. Respondent often interrupted the proceedings with claims that the foster-care worker was lying during her testimony and she also lashed out at the court directly. For these reasons, the trial court ordered respondent to participate in additional psychiatric evaluations and

---

[2] Respondent's four older children were placed with respondent's mother and subject to a guardianship. Their placement is not at issue in this appeal.

continue with supervised parenting time. The court also afforded respondent additional time to address her mental-health issues.

In September 2022, respondent was admitted for an in-patient psychiatric hospitalization after reporting that her heater was poisoning her. In November 2022, respondent went to her mother's home and demanded the return of her older children. Because the children were in school, respondent went there, screaming that numerous family members were raping them. The school contacted the police.

Thereafter, DHHS filed a supplemental petition to terminate respondent's parental rights to ASM under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). DHHS alleged that respondent failed to complete or benefit from her court-ordered services. DHHS also asserted that respondent was no longer participating in family and individual therapy and was not engaged during parenting time. DHHS further claimed that respondent's mental health was "unstable."

At the February 2023 termination hearing, respondent appeared virtually while undressed. Despite the trial court's order that she dress, respondent refused to do so, and the court removed her from the hearing. After dressing, respondent rejoined the proceedings.

The foster-care worker opined that respondent's ability to benefit from her court-ordered services was impeded by her mental health, defensiveness, unwillingness to participate in services, failure to accept help, and noncompliance with her psychiatrist's recommendations. And, during respondent's testimony, she continued to exhibit concerning behavior. More specifically, respondent testified that she was working for Facebook founder Mark Zuckerberg after he contacted her about a child trafficking scheme involving her children and the foster-care worker. Respondent claimed that Zuckerberg allegedly had a computer programmer who was able to "hack" into respondent's body so that Zuckerberg could speak with her. Respondent further claimed Zuckerberg was sending a representative to take her to see Governor Gretchen Whitmer. Respondent accused the foster-care worker of stalking her, kidnapping her children, and having a sexual relationship with the father of her children.

The trial court determined that respondent's testimony demonstrated that she was suffering from untreated mental illness and had not benefited from her treatment plan, including parenting classes and therapy. Therefore, the trial court found that there were statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

During the best-interests hearing, DHHS presented evidence that ASM did not have a bond with respondent and that respondent had not taken responsibility for her mental health. There was also evidence that ASM's foster parent could meet ASM's needs and provide ASM with permanence and safety, unlike respondent.

At the hearing, respondent continued to claim that the foster-care worker lied about respondent's lack of a bond with ASM because the worker was having an affair with the father of her older children. Respondent continued to deny having any mental-health issues, but continued to claim that she was working for Zuckerberg and made several bizarre remarks about mind control and experiments.

Relying on the bond between ASM and her foster parent as well as the foster parent's willingness to adopt and provide ASM with permanency and stability, the trial court found that termination was in ASM's best interests. This appeal followed.

## II. REASONABLE EFFORTS

Respondent claims the trial court erred by terminating her parental rights because DHHS did not make reasonable efforts to reunify her with ASM. We disagree.

## A. STANDARDS OF REVIEW

Generally, we review a trial court's decision regarding reasonable efforts for clear error. *In re Sanborn*, 337 Mich App 252, 258, 272; 976 NW2d 44 (2021). But because respondent failed to raise her argument before the trial court, it is unpreserved and reviewed for "plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008) (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re Sanborn*, 337 Mich App at 258 (quotation marks and citation omitted). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App at 9.

## B. ANALYSIS

> Generally, [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights. In general, when a child is removed from the parents' custody, [DHHS] is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan. [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. This general duty exists to reunite the parent and children unless certain aggravating circumstances exist. [*In re Sanborn*, 337 Mich App at 258-259 (quotation marks and citations omitted).]

The "contention that reasonable services were not offered ultimately relates to the issue of sufficiency" of the evidence in support of termination. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005). And, if DHHS is aware that the parent suffers from a disability, it has an affirmative duty to incorporate reasonable accommodations tailored to the disability into its service plan and services. *In re Hicks/Brown*, 500 Mich 79, 87-90; 893 NW2d 637 (2017). Although DHHS must make reasonable efforts to provide services to secure reunification, the parent is responsible for participating in the services offered. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

DHHS first became involved with respondent in August 2019 after CPS received a referral alleging that she was improperly supervising her older children and had mental-health issues that impacted her ability to care for them. To assist respondent, DHHS offered several services, including mental-health services, parenting classes, and employment and housing assistance. In March 2020, after taking jurisdiction over her older children, the trial court ordered respondent to participate in parenting classes, individual and family counseling, psychological and psychiatric evaluations, mental-health services, including taking prescribed medication, and supervised parenting time. In

-4-

March 2021, after receiving an updated psychiatric evaluation, the trial court ordered that respondent's parenting time take place in a therapeutic setting or during supportive parenting time. Respondent was given a supportive visitation coach to assist her during parenting time. After taking jurisdiction over ASM in August 2021, the trial court adopted respondent's prior treatment plan. Respondent did not object to the reasonableness of these services or request any accommodations.

After respondent reported having transportation issues that impacted her ability to travel to her psychiatric evaluation and parenting time, the foster-care worker repeatedly offered respondent bus passes, which she refused. The foster-care worker also made extensive efforts to relocate parenting time to an agency closer to respondent, even though her efforts were ultimately unsuccessful. Further, when respondent struggled to comply with her court-ordered services, the foster-care worker, on several occasions, re-referred respondent for services, including referrals for psychiatric evaluations and individual therapy.

On appeal, respondent fails to explain how these services were inadequate or how she would have fared better if additional services had been offered. See *In re Fried*, 266 Mich App at 541. Instead, respondent claims that DHHS failed to make reasonable efforts toward reunification because she was given inadequate support and insufficient time to come into compliance with her treatment plan. But respondent fails to acknowledge that she had almost four years to participate in and benefit from her court-ordered services before the trial court terminated her parental rights. Contrary to respondent's claim on appeal, respondent was provided with a supportive visitation coach and the foster-care worker made extensive efforts to aid respondent in becoming compliant with her court-ordered services.

Respondent further asserts that she should have been referred for specialized services to treat her mental-health issues. But, respondent does not explain how the multiple referrals for psychiatric and psychological evaluations or individual and family therapy were insufficient to accommodate and treat her mental-health needs. Nor does respondent identify any additional services she should have been offered. Respondent also ignores the impact of her own failure to participate in and benefit from the services offered. See *In re Frey*, 297 Mich App at 248. For example, the foster-care worker reported that respondent did not complete or benefit from her treatment plan despite the fact that she had been engaging in services since 2019, when the older children came under the court's jurisdiction. The foster-care worker indicated that respondent's mental health, defensiveness, and unwillingness to put the lessons into practice impeded her ability to benefit from the services offered and provided. The record shows that respondent participated in several psychological and psychiatric evaluations, but did not follow the psychiatrist's recommendations, such as taking psychotropic medications. Respondent did not consistently engage in individual therapy because she either refused to participate, only "nominally" addressed her issues, or engaged in volatile and threatening behavior. In fact, at the time of the termination hearing, respondent had not been engaged in family therapy for months because she refused to participate. Again, respondent vehemently denied having any mental-health issues throughout the proceedings, despite the fact that her failure to take responsibility for her mental health was repeatedly cited as the primary barrier to reunification with her children.

In sum, review of the record shows that DHHS offered and provided numerous services. And respondent's failure to complete her court-ordered treatment plan was not caused by DHHS omissions, but resulted from her refusal to participate in or lack of benefit from the services

offered. Stated otherwise, respondent has not met her burden of showing that plain error occurred. *In re Sanborn*, 337 Mich App at 258 (quotation marks and citation omitted); *In re Utrera*, 281 Mich App at 9.

## III. STATUTORY GROUNDS

Respondent argues that the trial court clearly erred when it terminated her parental rights. We disagree.

## A. STANDARDS OF REVIEW

We review for clear error a trial court's finding "that a ground for termination has been proven by clear and convincing evidence[.]" *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012) (quotation marks and citations omitted). "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* at 41 (quotation marks, brackets, and citation omitted). "This Court gives deference to a trial court's special opportunity to judge the weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014) (citation omitted).

## B. ANALYSIS

To terminate parental rights, the trial court must find by clear and convincing evidence at least one of the enumerated statutory grounds has been established. MCL 712A.19b(3). See also *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003). In this case, the trial court found there were four statutory grounds to terminate respondent's parental rights, citing to MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

Under MCL 712A.19b(3)(c)(*i*), a trial court may terminate a respondent's parental rights if "182 days or more have elapsed since the issuance of an initial dispositional order, and . . . the conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." The conditions that led to the initial adjudication were respondent's mental health and her inability to make "sufficient progress" on the earlier treatment plan involving her older children.

At the time of termination, even though respondent participated in individual therapy, she was not engaged in family therapy, she refused to follow her psychiatrist's recommendations, and she had been unemployed since July 2022. Respondent also appeared for the virtual termination hearing unclothed and continued to make repeated, unfounded assertions that the foster-care worker was abusing and kidnapping her children. Respondent further testified that she worked for Zuckerberg, who was able to hack into respondent's body to communicate with her. Despite exhibiting concerning mental-health issues, respondent denied needing therapy or even having any mental-health concerns aside from separation anxiety due to these proceedings. In fact, she claimed that she only attended therapy sessions to remain compliant with her treatment plan. Thus, the record established that, despite the services provided, respondent failed to benefit from them. And, nearly 21 months later, the mental-health issues that impaired respondent's ability to care for

ASM and ASM's older siblings continued to exist.[3]  Accordingly, the trial court did not err by finding statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*).[4]

## IV.  BEST INTERESTS

Respondent asserts that the trial court erred by terminating her parental rights because termination was not in ASM's best interests.  We disagree.

### A.  STANDARDS OF REVIEW

We review for clear error a trial court's finding that termination is in the child's best interests.  *In re Olive/Metts*, 297 Mich App at 40 (citations omitted).  "A trial court's decision is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made."  *Id*. at 41 (quotation marks, brackets, and citation omitted).  "The trial court should weigh all the evidence available to determine the children's best interests."  *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014).

### B.  ANALYSIS

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights."  *In re Olive/Metts*, 297 Mich App at 40.  "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence."  *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).  The focus of the best-interest determination is on the child, not the parent.  *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).  In determining whether termination is in a child's best interests, factors to consider include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home."  *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted).  Other relevant considerations are "the parent's compliance with . . . her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption."  *In re White*, 303 Mich App at 714.

On appeal, respondent asserts that the trial court failed to consider her bond to ASM, her compliance with her treatment plan, and her visitation history with ASM.  We disagree.

At the best-interests hearing, the trial court admitted a Best Interests Clinic report.  The report's author opined that the relationship between respondent and ASM "seemed very weak," and that respondent was "disengaged" from ASM, "inattentive," and "dependent on the foster parent to provide supplies for her child[.]"  Moreover, respondent's "interactions with [ASM] were

---

[3] The court issued its initial dispositional order on August 24, 2021, and its termination order 634 days later, on May 19, 2023.

[4] Because DHHS only needed to establish one statutory ground for termination, it is unnecessary for us to address whether termination was proper under MCL 712A.19b(3)(c)(*ii*), (g), or (j).  See *In re JK*, 468 Mich at 210.

an indication of likely neglectful parenting practices that could potentially lead to harm," based on respondent's failure to properly supervise, provide structure, and engage with ASM. Respondent was also observed to be "unstable as evidenced by her abrupt mood change, irritability, blaming others and false accusations." The report's author recommended that the court terminate respondent's parental rights based on these observations and respondent's failure to take accountability for her mental health.

During the best-interests hearing, ASM's foster parent testified that she had been caring for ASM since December 2021, when ASM was about six months old. ASM referred to her foster parent as "mom," and would look to her for comfort in times of distress. ASM's foster parent admitted that respondent had given ASM toys during visits, but denied that respondent provided any other supplies or support. The foster parent testified that she had a bond with ASM and was willing to adopt her.

The foster-care worker also testified that ASM and respondent did not exhibit a close bond, especially when compared to the bond that ASM had with her foster parent. The foster-care worker also reported that respondent's focus was largely on her older children and not on ASM during their visits.

On the other hand, respondent testified that she had a "super close" bond with ASM. Respondent purchased ASM clothes and gifts and could safely care for her.

Although respondent complied with certain aspects of her court-ordered services, she failed to benefit from them and, most importantly, failed to address her mental-health challenges. Both the Best Interest Clinic report and respondent's testimony pertaining to Zuckerberg, mind control, and experiments, demonstrate that respondent would likely be unable to provide ASM with the permanency, stability, and finality that she requires. Based on this record, we conclude that the trial court did not clearly err in concluding that termination of respondent's parental rights was in ASM's best interests.

Affirmed.

/s/ Christopher P. Yates
/s/ Anica Letica
/s/ Noah P. Hood